**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (CINCINNATI)**

| | | |
|---|---|---|
| **JEFFREY DAVIS, and** | : | **Case No.:** 1:18-cv-00771 |
| **TIFFANY CARROLL** | : | |
| | : | |
| **Plaintiffs,** | : | **Judge:** |
| | : | |
| **v.** | : | |
| | : | |
| **WORLD WIDE CONSULTING** | : | |
| **SERVICES, INC.,** | : | **COLLECTIVE / CLASS ACTION** |
| **PETER D. FERRIGAN, and** | : | **COMPLAINT AND JURY DEMAND** |
| **JEFF WYLER AUTOMOTIVE** | : | |
| **FAMILY, INC.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Plaintiffs Jeffrey Davis and Tiffany Carroll, by and through their attorneys, BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C. and GODBEY LAW, and on their own behalf and on behalf of the proposed class identified below, hereby submit this Collective / Class Action Complaint and Jury Demand against Defendants, World Wide Consulting Services, Inc. ("World Wide"), Peter D. Ferrigan, and Jeff Wyler Automotive Family, Inc. ("Jeff Wyler"), and allege and aver as follows:

## INTRODUCTION

1.      Plaintiffs' claims stem from an elaborate and far reaching fraudulent scheme perpetrated by Defendants, whereby Defendants (1) made various misrepresentations to Plaintiffs leading them to believe they had been hired by Jeff Wyler as car salespersons, (2) required Plaintiffs to participate in three days of training / orientation, with the promise that they would be paid for their time, (3) collected $500 from Plaintiffs for "training materials," with a promise of reimbursement after 90 days of employment at Jeff Wyler, (4) collected Plaintiffs' personality data, private health information, and social security numbers, and then (5) failed to further engage Plaintiffs, (6) failed to compensate Plaintiffs for the three-days of training as promised and as

required by law, and (7) failed to reimburse Plaintiffs the $500 they paid for training materials as promised.

2.      As set forth below, this scheme is not new. Upon information and belief, World Wide and Peter Ferrigan have perpetrated the same or similar schemes under the names UCS Auto LLC, Forever Revenue LLC, WWCS, WWCS, Inc., and Reliable Auto Marketing in many other cities with many other car dealerships throughout the country. Jeff Wyler Automotive Family, Inc. is merely one of the newer partners Peter Ferrigan and World Wide have acquired to further perpetrate this fraud.

3.      Upon information and belief, Defendants have repeatedly executed this scheme at numerous Jeff Wyler Automotive Family, Inc. dealerships on a weekly basis and perhaps more frequently.

4.      As alleged herein, however, Defendants' actions clearly violate numerous state and federal laws.

5.      Accordingly, Plaintiffs and the proposed class seek compensatory damages, punitive damages, liquidated damages, attorneys' fees, litigation costs, and injunctive relief sufficient to stop Defendants' ongoing scheme from harming others.

## **PARTIES**

6.      Plaintiff Jeffrey Davis ("Davis") is a resident and citizen of Hamilton County, Ohio.

7.      Plaintiff Tiffany Carroll ("Carroll") is a resident and citizen of Butler County, Ohio.

8.      Defendant World Wide Consulting Services, Inc. ("World Wide") is a North Carolina corporation with its principal place of business in Mecklenburg County, North Carolina. Defendant World Wide Consulting Services, Inc. can be served via its statutory agent Peter D. Ferrigan, 8200 Tower Point Drive, Charlotte, NC 28227.

9.      Upon information and belief, Defendant Peter Ferrigan is a resident and citizen of York County, South Carolina.

10.     Defendant Jeff Wyler Automotive Family, Inc. is an Ohio corporation with its principal place of business in Clermont County, Ohio. Defendant Jeff Wyler Automotive Family,

2

Inc. can be served via its statutory agent Corporate Statutory Services, Inc., 255 E. Fifth St., Suite, 2400, Cincinnati, OH 45202.

## JURISDICTION

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case is brought under the laws of the United States, specifically the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq.

12.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they are so related to Plaintiffs' federal law claims that they form part of the same case or controversy.

13.     This Court has personal jurisdiction over Defendants by virtue of their presence, residence, incorporation, operation, actions, and/or regular and systematic contacts in Ohio.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, because this district is where a substantial part of the events or omissions giving rise to the claims occurred and Defendants are subject to personal jurisdiction in this venue.

## FACTUAL ALLEGATIONS

**I.     PETER FERRIGAN AND WORLD WIDE CONSULTING SERVICES, INC.'S PROLIFIC SCHEME**

15.     Upon information and belief, Peter D. Ferrigan owns and/or controls World Wide Consulting Services, Inc., which markets itself as a sales-training company.

16.     As reported on the Better Business Bureau's website (accessible via URL: https://www.bbb.org/us/sc/fort-mill/profile/sales-training/world-wide-consulting-services-0473-103359/details#ad-review), World Wide Consulting Services, Inc. represents that (1) "WWCS, Inc. is the largest and # 1 sales-training & recruiting company for the Automotive, Marine, RV, and Motorcycle industries—in the world. We have been for the past 21 years!"; (2) WWCS, Inc. has "trained TENS OF THOUSANDS of salespeople in the auto business (more than any other sales training company, and their spin-offs)"; (3) "100,000+ Salespeople Trained."; (4) World Wide Consulting Services Inc., is the world's largest and most experiences [sic] sales training

company"; and (5) "We have servises [sic] thousands of dealerships nationwide, fro [sic] the smallest family owned, to the world's largest chains, and have trained more salespeople than all other training companies combined[.]"

17.    While the Better Business Bureau has challenged World Wide to substantiate these claims, the Better Business Bureau reports that World Wide never responded to its requests.

18.    Archived versions of World Wide's website clearly lays out its business model, stating:

"World Wide was established with the concept of helping ALL dealerships find great people, and helping people to help all car dealerships. We realized that attracting people to auto sales positions was the easy part -- if you put a creative ad in the newspaper, people would respond. Training the potential salespeople was also easy -- some of the best sales trainers in the country are involved in training car salespeople. Yet, we noticed that although sales trainees were taught the correct way to sell cars, the percentage of people with this training, who made it in the car business, was higher than with no training..., but not as high as we thought it could be.

**Why? No commitment.**

We found that by having the dealership pay for the salesperson's training, the dealership was making it easy for the trainees... easy for people to complete the training... easy enough for them to say that auto sales is too hard when the going gets tough. Automobile sales is not an easy profession! Automobile sales takes a lot of hard work and devotion from the salesperson, but the rewards are fruitful. World Wide designed a copyrighted training method that works well for everyone. We began by asking the salesperson to pay upfront for the initial sales training. By having a sales trainee pay upfront for the training, the trainee agrees to a form of commitment. Basically we knew that a sales training program had to be challenging, but not so difficult that trainees would run for the door! To show good faith, we suggested that the dealership offer their trainees reimbursement of their upfront investment after a short probation period. We knew that for the dealers,

4

reimbursement wasn't going to be about the money ... dealerships just wanted to have a salesperson who would stay on board, so reimbursing the sales trainee's investment was a small price to pay for a qualified, loyal salesperson. Our statistics show that almost every automobile sales trainee who stays on the job for about 90 days will flourish in the car business. Our effective training methods make it tougher for trainees to walk away, giving them an easier transition to be successful!" (See URL: https://web.archive.org/web/20060311023039/

http://www.wwcsonline.com/ourconcept.htm).

19.     Internet searches with the terms "world wide consulting services inc." clearly demonstrate that Peter Ferrigan and his company have implemented their plan across numerous states over the course of several years with multiple car dealerships.

20.     This is evident from reports on websites like pissedconsumer.com and ripoffreport.com. These reports, as well as a news story by WBTV Channel 3 from Charlotte North Carolina (accessible via URL: https://www.youtube.com/watch?v=C1ZaJ24Oc_U) reveal a common story: an individual responds to an advertisement for a sales position with a local car dealership. The individual goes to the dealership, interviews, believes him or herself to be hired, and then receives training on dealership property for several days. The individual is asked to pay several hundred dollars for their training and training materials and is told that the dealership will pay them back within 90 days. When training ends, however, the dealership fails to continue the employment relationship, refuses to refund the money, and directs the individual to call Peter Ferrigan and/or World Wide Consulting for a refund. Peter Ferrigan and/or World Wide Consulting then refuses to offer refund, leaving the individual without a job, without repayment of the $500 they paid for training materials, and without compensation for their three-days of training.

## II.    JEFF WYLER'S PARTICIPATION IN PETER FERRIGAN AND WORLD WIDE CONSULTING SERVICES, INC.'S SCHEME

21.    Defendant Jeff Wyler is an auto dealership with 15 locations throughout Ohio, Kentucky, and Indiana.

22.    For months, Jeff Wyler has posted advertisements for "Internet Sales Specialist" openings at many of its dealerships on Indeed.com, Ziprecruiter.com, its own website, and other job posting websites.

23.    For example, as of November 8, 2018, Jeff Wyler's website (accessible via URL: https://wyler.applicantpro.com//jobs/) listed 27 separate job postings for "Internet Sales Specialist" positions. (*See* Ex. A – Jeff Wyler Job Postings and Job Description.)

24.    These include listings for "Internet Sales Specialist" positions at Jeff Wyler Colerain – Honda, Jeff Wyler Colerain – Nissan, Jeff Wyler Columbus – Chevrolet, Jeff Wyler Eastgate – Chevrolet, among many others.

25.    Although these postings appear to be specific to particular Jeff Wyler dealerships, once an applicant clicks on a posting, only the Jeff Wyler Automotive Family is mentioned.

26.    These job postings describe the position as being "Full Time," and including benefits such as a "$600/week guarantee for first three months" and "Health plans/dental plans/life insurance/401k/paid vacations/employee pricing for vehicles, repair and service[.]" (*See* Ex. A.)

27.    The job postings further explain the position and the Jeff Wyler Automotive Family as follows:

> **"Money! Time! Multiple locations close to home! Opportunity!**
>
> It's time to make the most important move of your career! From our cooperative, team-based approach, to our dedication in molding you and encouraging advancement in your career, it's easy to see the difference within the Jeff Wyler Automotive Family. When you join the "Mid-West's Premiere Digital Dealership," you'll experience the best that a career in the automotive industry has to offer!

**Why Jeff Wyler Automotive Family**

As we continue to grow our dealerships through strong leadership, employee training, and by staying on the leading edge of emerging technologies, we value good people; our success begins and ends with YOU! We offer convenient scheduling options, an excellent compensation and benefits package including medical, dental, 401k, paid time off, and discounts on the purchase of vehicles and automotive services. Apply today and come join a team that rewards hard work and dedication!

**Who we're looking for** We are looking for highly motivated, energetic and dedicated individuals to fill the role of **Sales Consultant**. This role is a fast-paced and challenging position that relies on the ability to think and react quickly, formulate creative solutions to pressing problems, and serve customers with dedication. Those who can meet these challenges have nearly unlimited earning potential. **Sales Consultants** will interact with customers to address and resolve automotive needs by taking ownership of the customer experience.

**You know WHO we are! You know WHERE we are!  Come join us!**

With honesty and integrity for 45 years, the Jeff Wyler Automotive Family has provided service, satisfaction and value to our customers. This isn't just a job, it's a ***career*** that lends a good way of life that our employees enjoy!

**Apply today at wyler.com!**

28.     When interested individuals apply for the "Internet Sales Specialist" position, they submit their names, contact information, and resumes to Jeff Wyler.

29.     Jeff Wyler employees then contact these applicants to set up a time for them to come to Jeff Wyler, interview, fill out more paperwork, and attend a three-day orientation/training on Jeff Wyler's premises.

30.     When applicants arrive at Jeff Wyler, Jeff Wyler's own employees greet them.

31.     Indeed, the applicants interview with an individual who holds himself out as Jeff Wyler's "hiring manager."

32. The applicants are told the hiring manager's name is "Pete."

33. Jeff Wyler's hiring manager then has the applicants fill out a second round of employment paperwork.

34. Assuming they pass the interview, the applicants are told to take a "personality test" that evening through Jeff Wyler's online portal and return the next day in a white shirt and tie for training and orientation for their new job.

35. Unfortunately, the "training" includes no useful or transferrable education and instead consists mostly of "Pete" telling stories about himself and information about Jeff Wyler's policies.

36. The program does not in any way resemble vocational training.

37. On the first day, but prior to the start of training, the individuals who did not pass the personality test are dismissed. Training then begins. The trainees are told that they will receive compensation for the three days that they attend the orientation/training. Near the close of the first day, Jeff Wyler sends the trainees to get a drug test at Mercy Hospital.

38. The second day of training includes several exercises, such as the trainees pairing up and engaging in mock sales throughout Jeff Wyler's show rooms.

39. Near the end of the second day of training, the trainees are told that they must pay $500 to receive training materials to complete the orientation/training.

40. The trainees are then told that Jeff Wyler will give them $600 to reimburse them for the $500 payment after 90 days of employment at Jeff Wyler.

41. The hiring manager, "Pete" explains to the trainees that Jeff Wyler does not like having to charge its new employees for training materials, but too many individuals gain the vast knowledge and abscond with it.

42. "Pete" specifically asks that the trainees pay for the training materials with cash or a cashier check and indicates that Jeff Wyler will not accept credit cards for the transaction.

8

43.     Once the trainees pay the $500, they receive their "training manual." This consists of a cheaply bound document of approximately a dozen pages, riddled with typos and grammatical errors.

44.     After the trainees finish the three-day orientation, Jeff Wyler ceases all contact with them and it becomes clear that they will not in fact be continuing as full-time sales personnel for the Jeff Wyler Automotive Family.

45.     Accordingly, without any intention of hiring the trainees, Defendants obtain access to the trainee's personal medical records from Mercy Health, which includes not only their drug test results, but also their social security numbers.

46.     Defendants also obtain personal information on the trainees through the results of the personality test each trainee was required to take prior to training.

47.     To add insult to injury, the Jeff Wyler Automotive Family refuses to return the $500 the employees had paid for the orientation/training materials as promised.

48.     Jeff Wyler also refuses to compensate the trainees for the three days of training/orientation as promised and as required by law.

49.     When the trainees call Jeff Wyler to express their concerns, Jeff Wyler employees tell them that Jeff Wyler is not responsible to repay the money and that they should call "World Wide Consultants" to get a refund.

50.     Until this point, the trainees were never told about "World Wide Consultants" or that that the person with which they had been meeting, "Pete," was an agent of a third-party company.

51.     They were also never informed that their money was going to a third-party company.

52.     When the trainees then attempt to contact Peter Ferrigan and World Wide for a refund, Defendants refuse to return the money.

53.     Accordingly, through misrepresentations as to the trainees' status as Jeff Wyler's employees and a worthless training/orientation seminar, Defendants defraud each trainee out of

their time, three days' wages, $500, and  private and protected health information that includes, but is not limited to each trainee's name and social security number.

## III.     STATEMENT OF FACTS CONCERNING PLAINTIFF JEFFREY DAVIS

54.     Plaintiff Jeffrey Davis is a victim of Defendants' elaborate scheme.

55.     In July 2018, Mr. Davis was unemployed and looking for work.

56.     In conducting his job search, Mr. Davis saw Jeff Wyler's posting on Indeed.com for the "Internet Sales Specialist" position and applied.

57.     A Jeff Wyler employee promptly returned Mr. Davis's call and instructed him to go to Jeff Wyler's Mazda Dealership in Eastgate for an interview.

58.     Mr. Davis arrived at the Jeff Wyler Mazda Dealership and introduced himself to Jeff Wyler's receptionist, only to be told that he needed to meet with "Pete" at the Jeff Wyler KIA Dealership.

59.     Accordingly, Mr. Davis traveled to the KIA Dealership and again introduced himself to Jeff Wyler's receptionist, who handed Mr. Davis paperwork to complete.

60.     Mr. Davis completed the paperwork and a short time later, an individual approached Mr. Davis and introduced himself as "Pete Ferricone."

61.     The individual who introduced himself as "Pete Ferricone" was in reality Peter Ferrigan, but Mr. Ferrigan never revealed this to Mr. Davis.

62.     "Pete" then took Mr. Davis into one of Jeff Wyler's offices and proceeded to interview him for the sales position. Following the interview, "Pete" told Mr. Davis to return the next day in a shirt and tie for three days of training and orientation. Mr. Davis thought he was hired.

63.     "Pete" then instructed Mr. Davis to complete a personality test that evening through Jeff Wyler's online portal and gave him advice on how to answer some of the questions to increase his chance of passing.

64.     Mr. Davis took the personality test that night and submitted it to Jeff Wyler.

65.     The next day, Mr. Davis returned to the Jeff Wyler KIA Dealership and was ushered into a conference room with approximately 13 other individuals. Shortly thereafter, Jeff Wyler dismissed several individuals for failing to pass their personality tests. "Pete" then began the first of three days' worth of "training/orientation," which failed to provide transferable skills. Rather, "Pete" told stories and provided basic information about Jeff Wyler's policies.

66.     One of the first things "Pete" told Mr. Davis and the others in the room was that Jeff Wyler would pay them for their days in training / orientation.

67.     At the close of the first day, Mr. Davis went with the rest of his training class to Mercy Health to undergo a drug screening. According to Mercy Health's medical records, the results of the drug screening included each trainee's social security number. These results were emailed to Jeff Wyler employees Karen Masloski, Steve Baxla, and/or Emily Asher. (*See* Ex. B)

68.     Upon information and belief, Jeff Wyler sent approximately 10 new employees to Mercy Health each week to undergo drug screenings.

69.     The next day, Mr. Davis returned to Jeff Wyler's KIA Dealership for day two of training / orientation. Mr. Davis was paired up with another trainee and they were taken into Jeff Wyler's show room where they performed mock sales and show room tours.

70.     Towards the end of the second day, "Pete" informed Mr. Davis and the training class that they needed to pay $500 for training materials to successfully complete the training. "Pete" was clear, however, that Jeff Wyler would repay each person $600 within 90 days of their employment at Jeff Wyler.

71.     Unfortunately, Mr. Davis did not have $500 to pay for the materials. He therefore had to borrow $500 from his mother, who is on dialysis and only receives social security disability. Mr. Davis's mother graciously wrote her son a $500 check for the materials.

72.     When Mr. Davis arrived for his third and final day of training / orientation, he gave "Pete" the $500 check and received the training materials – a spiral bound document full of typos and grammatical errors.

73.    After the third day of training finished, "Pete" confronted Mr. Davis about his payment and informed Mr. Davis that he did not take personal checks. Accordingly, "Pete" sent Mr. Davis to the bank that evening to attempt to convert the check to cash. Mr. Davis was unable to get the check converted before the close of business.

74.    The next day, Mr. Davis received multiple calls about payment for his training materials. The callers told Mr. Davis that if he brought the $500 to the Jeff Wyler KIA Dealership, everything would be okay.

75.    Relieved, Mr. Davis obtained $500 cash and went to the Jeff Wyler KIA Dealership. When Mr. Davis arrived, he went to the Jeff Wyler receptionist and explained his situation. The receptionist directed Mr. Davis to see Jeff Wyler's cashier. Jeff Wyler's cashier then took Mr. Davis's $500 and placed it in the register.

76.    Several days passed after that without any contact from Jeff Wyler or "Pete." It soon became evident to Mr. Davis that Jeff Wyler was not continuing his employment and that he had been defrauded out of three days of pay, $500, and his personal information contained in his personality test and drug test.

77.    Mr. Davis called Jeff Wyler to ask for the refund he was promised for the $500 materials and compensation for his hours in training / orientation. Despite several messages and follow-up, the only response Mr. Davis ever received was that he should contact Peter Ferrigan of World Wide Consultants if he wanted his money back.

78.    This was the first time that Mr. Davis had heard the name Peter Ferrigan or World Wide Consultants or had any indication that the "Pete" that taught the three-day training seminar was anyone other than an employee of Jeff Wyler.

## IV.    STATEMENT OF FACTS CONCERNING PLAINTIFF TIFFANY CARROLL

79.    Like Mr. Davis, in or about July 2018, Ms. Carroll was unemployed and looking for a job.

80.    In performing searches online, she discovered Jeff Wyler's posting for the "Internet Sales Specialist" position and applied for the job.

81.     Soon thereafter, Jeff Wyler's agents/employees contacted her and invited her to come to one of its locations for an interview.

82.     When Ms. Carroll arrived at Jeff Wyler's facilities, she was interviewed by an individual who introduced himself as "Pete."

83.     Following the interview, Ms. Carroll understood that she was hired pending the results of her personality test and that after three days of training, Jeff Wyler would inform her of the specific dealership at which she would be working.

84.     Ms. Carroll completed the personality test that evening and arrived on schedule for training/orientation.

85.     Ms. Carroll was in the same training/orientation group as Mr. Davis and like Mr. Davis, was informed with the rest of the training group that Jeff Wyler would pay her for the three days she spent in training/orientation.

86.     Like Mr. Davis, Ms. Carroll also had to submit to a drug test at Mercy Health and endure three days of listening to "Pete" tell stories about himself and discuss Jeff Wyler's policies.

87.     Similarly, Ms. Carroll was told that she must pay $500 for training materials, with the promise that Jeff Wyler would reimburse her $600 after working for Jeff Wyler for 90 days.

88.     "Pete" explained that Jeff Wyler does this to (1) demand loyalty, and (2) to guarantee that he does not pay to train new employees who immediately leave his employment.

89.     Ms. Carroll was unemployed and consequently could hardly afford to pay $500 on her fixed income.

90.     Nonetheless, Ms. Carroll paid the $500 because she believed "Pete's" representations that she had the job and that Jeff Wyler would repay her after she worked there for 90 days.

91.     After the three-day training was completed, "Pete" told Ms. Carroll she had to submit to another round of interviews. This was the first time she had ever heard of a second round of interviews.

13

92.     Nonetheless, "Pete" assured her that this second round of interviews was conducted so the various managers could "fight" over Ms. Carroll for her "permanent" position within Jeff Wyler's Automotive Family.

93.     After leaving the third day, Ms. Carroll received no contact from "Pete" or Jeff Wyler.

94.     She eventually made multiple calls to Jeff Wyler to have her money refunded with no result.

95.     When she did speak with an employee of Jeff Wyler, she was told that "Pete" worked for another company. She was instructed to call "Pete" if she wanted her money returned.

96.     One employee at Jeff Wyler named "Chris" specifically instructed Ms. Carroll not to give his phone number to any of the other trainees because he did not want the trainees calling him to have their money returned.

97.     Ms. Carroll then researched Peter Ferrigan online and discovered his extensive history of defrauding unemployed individuals across the United States.

## CLASS ACTION ALLEGATIONS

*The Proposed FLSA Collective Action Against Jeff Wyler Automotive Family, Inc.*

98.     Plaintiffs bring this action on behalf of themselves and other similarly situated individuals, as authorized by the FLSA, 29 U.S.C. § 216(b). Plaintiffs have signed consent forms to institute this lawsuit, which are attached as Exhibit C.

99.     The Collective Class is defined as: All persons who within the last three years prior to the filing of this Complaint, have attended training and / or orientation run by Defendants Peter Ferrigan or World Wide Consulting Services, Inc. at a location owned or operated by Defendant Jeff Wyler.

100.    As set forth above, Plaintiffs are similarly situated to members of the Collective Class.

101.    Jeff Wyler has suffered and permitted Plaintiffs and the Collective Class to work without compensation, in violation of the FLSA.

14

102.    Any defenses Jeff Wyler may bring against Plaintiffs and the Collective Class are common to all members of the class. Should any individualized defenses exist, these defenses are minor when compared to the overall issues brought forward in this litigation.

103.    Allowing members of the Collective Class to assert claims in this litigation is fair to Plaintiffs, Jeff Wyler, and this Court. Allowing members of the Collective Class to assert claims in this litigation will reduce costs and allow for the resolution of multiple cases, common questions, and a common illegal scheme in one proceeding.

104.    Allowing members of the Collective Class to assert claims in this litigation also ensures that the Collective Class members have their day in court. While an individual class member may not have the means or ability to file an individual action against Jeff Wyler, this collective action affords the Collective Class the ability to prosecute their claims.

105.    Furthermore, this Collective Class unquestionably complies with Congressional intent to consolidate many small related employee FLSA claims into one lawsuit.

106.    Because Defendant is liable under the FLSA for failing to properly compensate Plaintiffs and the Collective Class, notice should be sent to the Collective Class.

107.    There are numerous similarly-situated individuals who have been denied appropriate compensation by Defendant, who would benefit from issuance of Court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Those similarly situated individuals are known to Defendant and are readily identifiable through Defendant's records.

*The Proposed Ohio Class Action*

108.    Plaintiffs also bring this action as a class action pursuant to Fed. R. Civ. P. 23 to remedy violations of Ohio state law.

109.    The proposed Rule 23 Class ("Rule 23 Class") is defined as: All persons who within the last four years prior to the filing of this Complaint, have attended training and / or orientation run by Defendants Peter Ferrigan or World Wide Consulting Services, Inc. at a location owned or operated by Defendant Jeff Wyler.

15

110.    The Rule 23 Class is so numerous that joinder of all members of the class is impractical. Upon information and belief, as many as 10 people per week underwent drug testing at Mercy Health alone in association with the fraudulent training program described above. Upon information and belief, Defendants' fraudulent scheme has been perpetrated for many months and continues to this day.

111.    Common questions of both law and fact exist as to all members of the Rule 23 Class. These common questions predominate over any questions affecting members of the class. For example, some common questions of law and fact include, but are not limited to:

    a.    Whether Jeff Wyler failed to pay appropriate compensation to members of the Rule 23 Class;

    b.    Whether Defendants fraudulently and intentionally misrepresented facts about the training seminar and training materials in order to collect $500 and personal information from each trainee;

    c.    Whether the questions contained on the personality test were germane to a job in sales;

    d.    Whether Defendants have profited from Rule 23 Class's private health information;

    e.    Whether Defendants' actions were "willful;" and

    f.    The proper measure of damages sustained by the Rule 23 Class.

Answers to these and other common questions will resolve both Plaintiffs' and the Rule 23 Class's lawsuits.

112.    Plaintiffs' claims are typical, if not identical, to the claims of the Rule 23 Class.

113.    Plaintiffs will fairly and adequately protect the interests of the Rule 23 Class. Plaintiffs envision no difficulty in the management of this action as a class action. Furthermore, Plaintiffs have retained Counsel competent and experienced in class action litigation, including class action litigation related to employment issues.

114.    Class action treatment is superior to other alternatives for the fair and efficient adjudication of the controversy alleged herein. Such common treatment will permit a large number

of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would entail.

115.     This is particularly true here because of the presence of the Collective Class. For example, the facts and materials relevant to the adjudication of the FLSA claims are relevant to the adjudication of the state law claims. Accordingly, the Court's evaluation of FLSA requirements is highly relevant to the state law claims of the Rule 23 Class.

116.     Furthermore, the amounts at stake for many Class Members, while substantial, may not enable them to maintain separate lawsuits against Defendants. Utilizing the class action mechanism allows these Class Members to have their day in court.

117.     No difficulties are likely to be encountered by the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

118.     The identities of the Rule 23 Class are easily identifiable from the applications and drug screen records in Defendants' possession.

119.     Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.

120.     Without a class action, Defendants will likely retain the benefits of their wrongdoing and will continue a course of action which will only harm more individuals.

**FIRST CAUSE OF ACTION**
FAILURE TO PAY MINIMUM WAGES
IN VIOLATION OF THE FLSA, 29 U.S.C. § 206, ET SEQ.

121.     Plaintiffs and the Collective Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

122.     Plaintiffs consent in writing to be a part of this action, pursuant to 29 U.S.C. § 216(b).  Their consent forms are filed herewith as Exhibit C.  As this case proceeds, it is likely that other individuals will sign consent forms and join as plaintiffs.

123. At all relevant times, Defendant Jeff Wyler was an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 203.

124. At all relevant times, Plaintiffs and each member of the Collective Class were Jeff Wyler's "employees."

125. This is evident from the fact that the training/orientation program was primarily for the benefit of Jeff Wyler, not the trainees. Indeed, World Wide makes this clear in its business plan. Specifically, World Wide explains that by having the trainees pay for their training, with a promise of reimbursement by the dealership, the trainees form a commitment to the dealership, thereby reducing attrition of salespeople and ensuring the dealership's salespeople are well trained and loyal.

126. Furthermore, upon information and belief, the training, which occurred over three-days, displaced regular employees. Each day of training occupied Jeff Wyler's conference rooms and during training, Plaintiffs and the Collective Class engaged in sales exercises on Jeff Wyler's showroom floors during regular business hours.

127. Such sales exercises on the showroom floor during regular business hours provided immediate benefits to Jeff Wyler as it made Jeff Wyler's showrooms appear busier with customers.

128. Indeed, the "training" was not vocational in nature and instead comprised of storytelling and instruction on Jeff Wyler's internal policies.

129. Moreover, as described above, prior to participating in the training, Plaintiffs and the Collective Class had a reasonable basis to expect that they were hired and/or entitled to a job following the training. In fact, during training Plaintiffs and the Collective Class were specifically told that they would be paid for their time during training and that Jeff Wyler would reimburse them for their training materials within 90 days of working for Jeff Wyler.

130. Upon information and belief, Jeff Wyler gave World Wide and Peter Ferrigan the express authority to conduct its hiring and training, as well as make all representations, promises, and decisions regarding applicants and trainees during the hiring and training process.

131. The economic realities of Plaintiffs' and the Collective Class's relationship with Jeff Wyler clearly reflect that Plaintiffs and the Collective Class were Jeff Wyler's employees during the three-day training/orientation.

132. The FLSA requires that covered employers, such as Defendant Jeff Wyler, compensate employees, such as Plaintiffs and the Collective Class, at an appropriate regular and minimum rate for all work performed for its benefit, and not subject to a statutory exemption.

133. Nonetheless, Jeff Wyler failed to pay Plaintiffs and the Collective Class minimum wage for their time attending the mandatory three-day training / orientation.

134. Jeff Wyler's violations of the FLSA were willful and Jeff Wyler intentionally conspired to create a scheme that would violate the FLSA and the Collective Class's rights.

135. The foregoing conduct, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C. § 255(a).

136. Plaintiffs, on behalf of themselves and the Collective Class, seek damages in the amount of their unpaid compensation, liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and such other legal and equitable relief as the Court deems just and proper.

137. Plaintiffs, on behalf of themselves and the Collective Class, seek recovery of attorneys' fees and costs to be paid by Defendant, as provided by the FLSA, 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
FAILURE TO PAY MINIMUM WAGES
IN VIOLATION OF OHIO CONST. ART. II, § 34a.

138. Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

139. Defendant Jeff Wyler is and was, at all relevant times, an "employer" as defined by the Ohio Const. Art. II, § 34a.

140. During the three-day training / orientation period described above, Plaintiffs and the Rule 23 Class were "employees" as defined by the Ohio Const. Art. II, § 34a.

141.    During the course of their employment, Defendant Jeff Wyler failed to compensate Plaintiffs and the Rule 23 Class and therefore violated Ohio Const. Art. II, § 34a. by paying Plaintiffs and the Rule 23 Class less than Ohio's minimum wage.

142.    Based on the facts noted above, Defendant Jeff Wyler willfully or recklessly violated Ohio law, Plaintiffs' rights, and the rights of the Rule 23 Class.

143.    As a result of Defendant Jeff Wyler's conduct, Plaintiffs and members of the Rule 23 Class have suffered economic damages in the form of unpaid minimum wages.

### THIRD CAUSE OF ACTION
VIOLATION OF THE OHIO PROMPT PAY ACT, O.R.C. § 4113.15

144.    Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

145.    During the three-day training / orientation period described above, Plaintiffs and the Rule 23 Class Members were "employees" of Defendant Jeff Wyler.

146.    Defendant Jeff Wyler is a "corporation" doing business in Ohio.

147.    Plaintiffs and the Rule 23 Class worked for Defendant Jeff Wyler at an agreed upon rate of compensation - $600 per week for the first 3 months of employment or, in the alternative, Ohio's minimum wage.

148.    As previously discussed, Defendant Jeff Wyler failed to appropriately compensate Plaintiffs and members of the Rule 23 Class for their time in training / orientation.

149.    Accordingly, Defendant Jeff Wyler violated O.R.C. § 4113.15 by failing to pay Plaintiffs and the Rule 23 Class (1) on or before the first day of each month for all wages and benefits earned by them during the first half of the preceding month ending with the fifteenth day thereof, and (2) on or before the fifteenth day of each month all wages and benefits they earned during the last half of the preceding calendar month.

150.    Based on the facts above, Defendant Jeff Wyler willfully or recklessly violated Ohio law, Plaintiffs' rights, and the rights of the Rule 23 Class.

151.    As a result of Defendant Jeff Wyler's conduct, Plaintiffs and the Rule 23 Class have suffered economic damages in the form of unpaid wages and any attendant unpaid benefits to which they would have been entitled had their wages been appropriately calculated.

152.    Plaintiffs and the Rule 23 Class are also entitled to liquidated damages pursuant to O.R.C. § 4113.15(b).

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT

153.    Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

154.    Defendant Jeff Wyler offered Plaintiffs and the Rule 23 Class employment as sales persons for a guaranteed rate of compensation of $600 per week for the first three months of employment.

155.    Defendant Jeff Wyler offered to pay Plaintiffs and the Rule 23 Class for the time they spent in the three-day training/orientation seminar.

156.    Defendant Jeff Wyler further offered to repay Plaintiffs and the Rule 23 Class $600 within 90 days of employment if they purchased the $500 training materials distributed during the three-day training / orientation.

157.    Plaintiffs and the Rule 23 Class accepted their individual offers as is evidenced by the fact that Plaintiffs and the Rule 23 Class sat through Defendants' three-day training / orientation seminar and paid Defendants $500 for training materials.

158.    Defendant Jeff Wyler, however, failed to pay Plaintiffs and the Rule 23 Class wages consistent with their agreements and furthermore failed to repay Plaintiffs and the Rule 23 Class $600 for the purchased training materials.

159.    As a direct and proximate result of Defendant Jeff Wyler's breach of contract, Plaintiffs and the Rule 23 Class have suffered damages in the form of unpaid contractual wages and $600 each for their training materials.

**FIFTH CAUSE OF ACTION**
FRAUD / NEGLIGENT MISREPRESENTATION

160.     Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

161.     As described above, Defendants Jeff Wyler, Peter Ferrigan, and World Wide Consulting Services, Inc. intentionally and/or negligently made material misrepresentations of fact to Plaintiffs and the Rule 23 Class. These include, but are not limited to the following:

    a.   Jeff Wyler would pay Plaintiffs and the Rule 23 Class for their time during training/orientation;

    b.   Jeff Wyler would reimburse Plaintiffs and the Rule 23 Class $600 within 90 days of employment for the $500 spent on training materials; and

    c.   Plaintiffs were hired as Jeff Wyler salespersons and Jeff Wyler would employ Plaintiffs and the Rule 23 Class following the training/orientation period.

162.     Furthermore, Defendant Jeff Wyler intentionally made material omissions of fact to Plaintiffs and the Rule 23 Class. These material omissions include, but are not limited to the following:

    a.   Jeff Wyler never intended to pay Plaintiffs and the Rule 23 Class for their three-day training / orientation, despite knowing that Defendants Peter Ferrigan and World Wide Consulting Services, Inc. represented otherwise to Plaintiffs and the Rule 23 Class;

    b.   Jeff Wyler never intended to employ Plaintiffs and the Rule 23 Class after the three-day training, despite knowing that Defendants Peter Ferrigan and World Wide Consulting Services, Inc. represented otherwise to Plaintiffs and the Rule 23 Class; and

    c.   Jeff Wyler never intended to refund Plaintiffs $600 for the training materials Plaintiffs and the Rule 23 Class purchased for $500, despite knowing that Defendants Peter Ferrigan and World Wide Consulting Services, Inc. represented otherwise to Plaintiffs and the Rule 23 Class.

163.    Defendant Jeff Wyler had a duty to disclose these material omissions, as it knew that Defendants Peter Ferrigan and World Wide Consulting Services, Inc. were making material misrepresentations of fact to Plaintiffs and the Rule 23 Class on Jeff Wyler's property while acting as agents of Jeff Wyler.

164.    Plaintiffs and the Rule 23 Class justifiably relied upon these misrepresentations and omissions of material fact, causing them to sit through three-days of training/orientation, pay Defendants $500, and provide Defendants with personal information in the form of personality testing, and health and personal identity information, including social security numbers.

165.    Defendants never intended to make legitimate use of the personality testing, drug testing, and other personal data provided by Plaintiffs and the Rule 23 Class, as Defendants had no actual intent to offer continued employment to Plaintiffs and the Rule 23 Class after the training/orientation program.

166.    As a direct and proximate result of Plaintiffs' and the Rule 23 Class's justifiable reliance upon Defendants' material misrepresentations and omissions, Plaintiffs and the Rule 23 Class have suffered and will continue to suffer damages and harm.

167.    As described herein, Defendants' actions and omissions demonstrate a flagrant disregard for the rights of Plaintiffs and the Rule 23 Class, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## SIXTH CAUSE OF ACTION
INVASION OF PRIVACY – INTRUSION UPON SECLUSION

168.    Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

169.    As described above, Defendants Jeff Wyler, Peter Ferrigan, and World Wide Consulting Services, Inc. intentionally made material misrepresentations and omissions of fact in order to persuade Plaintiffs and the Rule 23 Class to provide personal information in response to personality testing and provide protected health and identity information through a drug screening.

170.    Indeed, by collecting this information without any intent to employ Plaintiffs and the Rule 23 Class following the three-day training and payment of $500, Defendants invaded the privacy of Plaintiffs and the Rule 23 Class and exposed them to the risk of identity theft.

171.    Defendants' acts of collecting such private information without any intent of continued employment would be highly offensive and cause outrage to a reasonable person.

172.    Defendants' acts were in fact highly offensive and did cause outrage to Plaintiffs and the Rule 23 Class.

173.    As a direct and proximate result of Defendants' actions, Plaintiffs and the Rule 23 Class have and will continue to suffer harm.

174.    As described herein, Defendants' actions and omissions demonstrate a flagrant disregard for the rights of Plaintiffs and the Rule 23 Class, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION
VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT

175.    Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

176.    Defendants are "persons" within the meaning of O.R.C. § 4165.01(D).

177.    Plaintiffs and the Rule 23 Class are "persons" within the meaning of O.R.C. § 4165.01(D).

178.    Defendants have engaged in actions that violate the Ohio Deceptive Trade Practices Act by making untrue, deceptive, or misleading representations of material facts and omitting and/or concealing material facts from Plaintiffs and the Rule 23 Class.

179.    As described above, in violation of O.R.C. § 4165.02(A), Defendants' actions could cause and did in fact cause confusion and misunderstanding as to the source, sponsorship, and approval of the three-day training / orientation seminar and $500 training materials.

24

180. Defendants' actions similarly could cause and did in fact cause confusion and misunderstanding as to each Defendants' affiliation, connection, and association with the other Defendants, the three-day training seminar, and the $500 training materials.

181. Likewise, Defendants falsely represented that the three-day training seminar and $500 training materials had the sponsorship, approval of Jeff Wyler and that their cost would be reimbursed.

182. Finally, Defendants falsely represented the sponsorship, approval, status, affiliation, and connection between Jeff Wyler, Peter Ferrigan, and World Wide Consulting Services, Inc.

183. Defendants intended for Plaintiffs and the Rule 23 Class to rely upon the previously noted materially deceptive trade practices.

184. Plaintiffs and the Rule 23 Class relied to their detriment upon Defendants' materially deceptive practices.

185. As a direct and proximate result of Defendants' violation of the Ohio Deceptive Trade Practices Act, Plaintiffs and the Rule 23 Class have been misled, deceived, and suffered actual damages. Plaintiffs and the Rule 23 Class seek actual damages, any statutorily permissible damages, attorneys' fees, expenses, costs, and all other relief allowable pursuant to O.R.C. § 4165.03.

## EIGHTH CAUSE OF ACTION
### CIVIL CONSPIRACY

186. Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

187. As described above, Defendants worked together to lure Plaintiffs and the Rule 23 Class into the three-day training / orientation seminar in order to collect $500 and private information, including social security numbers.

188.     Defendants could not have executed their plan alone. Rather, Jeff Wyler relied upon Peter Ferrigan and World Wide Consulting Services, Inc. to provide the idea for the scheme, the "training" personnel, and the "training" materials.

189.     Peter Ferrigan and World Wide Consulting Services, Inc. relied upon Jeff Wyler to provide job postings and the prospect of employment to Plaintiffs and the Rule 23 Class and space at Jeff Wyler's facilities in order to cloak the training / orientation program and materials as being required for continued employment.

190.     Through their combined efforts, Defendants maliciously engaged in fraud, violations of state and federal employment laws, violations of Ohio's Deceptive Trade Practices Act, and violations of Plaintiffs' and the Rule 23 Class's privacy rights, among other illegal acts.

191.     As a direct and proximate result of Defendants' actions, Plaintiffs and the Rule 23 Class have suffered and will continue to suffer damages.

192.     As described herein, Defendants' actions and omissions demonstrate a flagrant disregard for the rights of Plaintiffs and the Rule 23 Class, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## NINTH CAUSE OF ACTION
### CONVERSION

193.     Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

194.     Defendants represented to Plaintiffs and the Rule 23 Class that if they paid Defendants $500 for training materials, within 90 days, Jeff Wyler would repay Plaintiffs and the Rule 23 Class $600.

195.     As described above, Defendants intentionally defrauded Plaintiffs and the Rule 23 Class and took the $500 without any intention of reimbursing the payments.

196.     Defendants maliciously and unlawfully exercised control and dominion over Plaintiffs' and the Rule 23 Class's funds as to completely deprive them of their ownership of these funds.

197.     As a direct and proximate result of Defendants' actions, Plaintiffs and the Rule 23 Class have and will continue to suffer damages.

198.     As described herein, Defendants' actions and omissions demonstrate a flagrant disregard for the rights of Plaintiffs and the Rule 23 Class, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## INJUNCTION

199.     Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

200.     As alleged in this Complaint, Defendants' have and continue to perpetrate an illegal scheme to fraudulently obtain $500, personality data, private health information, and social security numbers from those individuals like Plaintiffs and the Collective and Rule 23 Classes, who are merely trying to find a job.

201.     As victims of this scheme, Plaintiffs and the Collective and Rule 23 Classes' private personality data, private health information, and social security numbers are unsecure and in Defendants' possession. Plaintiffs and the Collective and Rule 23 Classes specifically request injunctive relief enjoining Defendants from any use or disclosure of their private personality data, private health information, and social security numbers. Absent such an injunction, Plaintiffs and the Collective and Rule 23 Classes will face a substantial and imminent risk of identity theft.

202.     Plaintiffs and the Collective and Rule 23 Classes further seek injunctive relief enjoining Defendants from continuing to hold the fraudulent training/orientation seminars described at length above. Absent such an injunction, Defendants will continue to engage in the conduct described herein, further defrauding individuals of their personal information, $500, and rightfully earned wages.

203.     Finally, Plaintiffs and the Collective and Rule 23 Classes seek injunctive relief in order to freeze all personal funds, accounts, and assets belonging to Peter Ferrigan and World Wide Consulting Services, Inc. until the conclusion of this matter. As described above, upon information and belief, Peter Ferrigan has operated the same or similar scheme to that at issue in

this Complaint through various other businesses such as UCS Auto LLC, Forever Revenue LLC, WWCS, WWCS, Inc., and Reliable Auto Marketing in many other cities throughout the country. Furthermore, Peter Ferrigan has used fictitious names when conducting his business and introduced himself to Jeffrey Davis as Pete Ferricone. Absent such an injunction, there is a substantial risk that Peter Ferrigan will change names or businesses again and that that Plaintiffs and the Collective and Rule 23 Classes will be unable to recover any monetary relief from Peter Ferrigan and World Wide Consulting Services, Inc. flowing from the harm they have caused.

204.    Such injunctive relief will not harm any third parties. In fact, the requested injunctive relief will benefit third parties and the public interest as it will stop Defendants' fraudulent practices and protect those already affected from further harm and losses.

## CONSTRUCTIVE TRUST

205.    Plaintiffs and the Rule 23 Class allege and incorporate by reference the allegations contained in the preceding paragraphs and further state as follows.

206.    In executing the fraudulent scheme described above, Defendants wrongfully took possession of Plaintiffs' and the Rule 23 Class's property, including $500 from each class member, personality data, private health information, and social security numbers.

207.    This wrongfully acquired property can be readily identified and traced.

208.    Given the circumstances of this case, it would be inequitable for Defendants to maintain possession of this property.

209.    Accordingly, Plaintiffs and the Rule 23 Class respectfully request that the Court form a constructive trust to protect Plaintiffs' and the Rule 23 Class's funds, personality data, private health information, and social security numbers.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated members of both the Collective Class and Rule 23 Class, request that this Court grant the following relief against Defendants:

1.      Designation of this action as a collective action on behalf of the Collective Class, prompt issuance of notice pursuant to 29 U.S.C. § 216(b) apprising all members of the Collective Class of the pendency of this action and permitting them to assert timely FLSA claims in this action by filing individual Consents to Join pursuant to 29 U.S.C. § 216(b), and prompt notice to all Collective Class members that each has the right to "opt-in" to this litigation pursuant to 29 U.S.C. § 216(b);

2.      Designation of Plaintiffs Jeffrey Davis and Tiffany Carroll as Representatives of the Collective Class;

3.      Designation of undersigned counsel as Collective Class counsel; and

4.      An order declaring that Defendants' FLSA violations were willful;

5.      On the Ohio Causes of Action, designation of this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, and prompt issuance of notice pursuant to Fed. R. Civ. P. 23(c)(2) apprising all members of the Rule 23 Class of the pendency of this action and permitting them to assert their state law claims in a timely manner;

6.      Designation of Plaintiffs Jeffrey Davis and Tiffany Carroll as Representatives of the Rule 23 Class;

7.      Designation of undersigned counsel as Rule 23 Class counsel;

8.      Injunctive relief;

9.      The creation of a constructive trust to protect Plaintiffs' and the Rule 23 Class's funds, personality data, private health information, and social security numbers.

10.      All monetary and statutory relief available as a result of Defendants' FLSA violations;

11.     All monetary and statutory relief available as a result of Defendants' violations of Ohio law;

12.     Attorneys' fees, expenses, and costs in this action; and,

13.     Such further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Janet Abaray*
Janet G. Abaray (2943)
David C. Harman (87882)
**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE P.C.**
312 Walnut St., Suite 2090
Cincinnati, OH 45202
Phone: (513) 852-5600
Fax: (513) 852-5611
Email: jabaray@burgsimpson.com
Email: dharman@burgsimpson.com

and

Matthew Miller-Novak (91402)
**GODBEY LAW**
708 Walnut St., Suite 600
Cincinnati, OH 45202
Phone: (513) 241-6650
Fax: (513) 241-6649
Email: matt@godbeylaw.com

*Attorneys for Plaintiffs*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

*/s/ Janet G. Abaray*
Janet G. Abaray (2943)